IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

AARON THOMPSON,

Defendant.

REPORT AND RECOMMENDATION

14-cr-90-wmc

---

**REPORT**

On August 27, 2014, the grand jury returned a two- count indictment that charged defendant Aaron Thompson with distributing cocaine base (crack cocaine) on March 5, 2014 and with possessing cocaine base with intent to distribute it on that same day.

Thompson, by counsel, has moved to suppress audiovisual recordings made by a drug task force informant inside an apartment at which Thompson was staying. *See* dkt. 13. Thompson contends that this surreptitious use of video recorders (the informant had two) violated his reasonable expectation of privacy in the apartment he was visiting. Thompson concedes that he invited the informant into the residence, but he did not know that the informant was equipped with video recorders, which he never would have allowed onto the premises. Thomas argues that this exceeded the scope of his permission to enter and therefore constituted a trespass by the police, the remedy for which is to suppress the recordings. *See* dkt. 13.

The government opposes the motion, contending that because the video recording devices simply documented what the informant saw and heard, there was no trespass and no warrantless search. *See* Br. in Opp., dkt. 25 at 1-2. The government is correct. Where a confidential informant who enters a private residence is secretly equipped with devices that record no more than what the informant also can see and hear, there is no trespass and no violation of any

reasonable expectation of privacy. All courts that have considered this question have so ruled, and the Supreme Court cases cited and analogized by Thompson are distinguishable. Perhaps different circumstances might militate toward a different result, but that is not this case. I am recommending that the court deny Thompson's motion to suppress.

Thompson initially requested an evidentiary hearing on his motion, but the parties then agreed that the material facts were not genuinely disputed and could be submitted to the court in writing. Based on the documents submitted by the parties, I find the following facts:

## FACTS

On March 4 and 5, 2014, defendant Aaron Thompson was staying alone at his friend's apartment at 432 Rose Street, Apt. 4, La Crosse. Apparently the unnamed friend was not there during this period, but according to Thompson he allowed Thompson to spend the night in his absence, to keep his possessions there during Thompson's stay, and to invite or exclude visitors. (Thompson Aff., dkt. 13-1; Singleton Aff., dkt. 14). Thompson doesn't identify his friend, but this person was Ernest Knox.[1]

At that time, the West Central Metropolitan Enforcement Group (the "task force") was investigating the Knox family: Ernest, Derrick, Eric and Daryl. *See* dkt. 14-2 at 1[2] The task force had used a confidential informant– "CI 292"–to buy crack cocaine from various members

[1] The government questions whether Thompson's self-serving, vague affidavit establishing his connection to Knox's apartment suffices to establish that Thompson had a genuine expectation of privacy in it, but the government does not back up its skepticism with any evidence that would call into question the veracity of Thompson's sworn assertions.

[2]. On April 23, 2014, Derrick Knox was charged in 14-cr-46-jdp with distributing crack cocaine, but the government dismissed its indictment without prejudice on September 3, 2014. Ernest Knox was convicted of distributing crack cocaine in 14-cr-48-jdp. Eric Knox was convicted of distributing crack cocaine in 14-cr-47-jdp. Daryl apparently has been charged in state court.

of the Knox family on a number of occasions. On March 5, 2014, CI 292 called a telephone number associated with Ernest Knox to see if he could buy some crack cocaine. CI 292 told the man who answered the phone that he was in town with "four bills" ($400) and asked if he could swing by. The man responded "hey man, come on." *See* dkt. 14-4.

Task force members met with CI 292 to prepare for this attempted purchase of crack cocaine at Ernest Knox's apartment. The task force members provided CI 292 with $400 in prerecorded buy money. They also equipped CI 292 with a mobile digital audio/video recorder, a body digital audio/video recorder (a/k/a "button-cam"), and a remote audio transmitter. Dkts. 14-7, 14-8 and 14-9 are compact discs of the sounds and images recorded by each of these three devices while CI 292 wore them. The specifications of the two digital audio/video recording devices are set forth in dkt. 19, under seal. (Thompson reveals some of the specs in his brief, but the spec sheet itself shall remain sealed). For the purposes of this report, I note only that the angle of view captured by these devices was less than the average 180° human forward-facing horizontal field of view (*see* http://en.wikipedia.org/wiki/Field_of_view), and the video resolution of these devices does not exceed that of a standard progressive HDTV at a 16:9 aspect ratio (*see* http://en.wikipedia.org/wiki/720p). Watching and listening to the recordings made by CI 292's button cam (which seems to be at about collar hieght) and the other digital A/V recording device (which captured essentially the same images from closer to a waist-high perspective) establishes that the nature and quality of the images and sounds captured inside the apartment do not exceed that of run-of-the-mill home video equipment.

As Thompson points out, the task force had not sought or obtained a search warrant or other court order that pre-authorized sending CI 292 into a suspect's apartment while equipped with hidden video recorders.

At about 12:25 that afternoon, task force agents dropped off CI 292 near the apartment and CI 292 walked the rest of the way. The agents monitored in real time the audio broadcast from CI 292's audio transmitter. CI 292 entered the apartment returned to the agents within about five minutes, handing over twelve rocks of crack cocaine (about 3.8 grams total) each wrapped in a knotted baggie corner. The officers retrieved their recording equipment and the recordings made by CI 292 of his meeting with the person who sold him the drugs, who happened to be the defendant, Aaron Thompson.

Within 20 minutes, task force agents orally debriefed CI 292 about what he had personally heard and seen in the apartment; a transcript of the recording of that debriefing may be found at dkt. 14-6. Briefly, CI 292 reports that upon knocking on the apartment door, one man lets him in; CI 292 sees another man nearby. When CI 292 handed his $400 to one of these men, that man knocked on the closed bathroom door. CI 292 could hear two other people inside the bathroom. The man passed the $400 through the partially opened door and the people in the bathroom handed out a sandwich bag; the man dealing with CI 292 reached into this bag and began counting out 12 individual bags of crack cocaine rocks. Meantime, the other man in the front area threw something into the microwave to cook; CI 292 reported that this was crack cocaine. The cooker told the man dealing with CI 292 that the cooker was leaving, so lock the door behind him, and when the product was done cooking, put some ice on it to cool it down.

CI 292's verbal report is corroborated by the two overlapping audiovisual recordings he made of his visit to the apartment. CI 292 also reported seeing a box of baking soda next to the microwave as well as a plastic soup bowl over half full of cocaine; these observations are not immediately apparent on the videos but perhaps can be seen with a more careful review.

**Analysis**

Thompson contends that this court to suppress the audiovisual recordings made by CI 292 because a police informant's surreptitious use of a video camera inside a private residence constitutes a search for which a warrant is required, even if the informant has been invited into the residence. Thompson breaks this contention into four points: (1) CI 292's video recording of the interior of the apartment was "an unreasonable search" under *Katz v. United States*, 389 U.S. 347 (1967) because "extraordinary intrusiveness of covert video surveillance into the highest privacy expectations enjoyed within the home [ ] outweigh the applicable law enforcement interests." (2) this was a "trespass" under *United States v. Jones*, ___ U.S. ___, 132 S.Ct. 945 (2012) and *Florida v. Jardines*, 561 U.S. 1, 133 S.Ct. 1409 (2013) because CI 292's entry into the home by deception to record what happened was an unlicensed governmental intrusion into a constitutionally protected area to obtain information; and (3) the Court's plurality opinion in *United States v. White*, 401 U.S. 475 (1971) is distinguishable; and (4) The Fourth Amendment does not give the government unfettered discretion to employ informants to perform covert video surveillance in homes; there must be judicial oversight. *See* Br. in Support, dkt. 24, at 1-2.

Thompson bases his first contention on the Supreme Court's "reasonable expectation of privacy" test created in *Katz*, which protects from seizure communications in which the speaker has exhibited an actual (subjective) expectation of privacy and this expectation is one that society is prepared to recognize as reasonable. 389 U.S. at 361. With *Katz* as his starting point, Thompson then cites to a generic observation in dicta by a concurring judge (Kozinski, J.) in *United States v. Koyomejian*, 970 F.2d 536 551 (9th Cir. 1992)(en banc) that "video surveillance can result in serious intrusions into personal privacy." But the actual issue before the court in *Koyomejian* is factually distinguishable from Thompson's situation. In *Koyomejian*, the court was asked to determine what constraints to put on the government's secret, non-consensual *installation* of video surveillance cameras inside the business office of a company suspected of money laundering. The court held that the Fourth Amendment required the government to obtain a court order first, which the court should issue only if the government met the strict requirements for non-consensual wiretaps [now governed by Title III]. 970 F.3d at 542.

Thompson also cites *United States v. Corona-Chavez*, 328 F.3d 974, 981 (8th Cir. 2003) again quoting a generic observation in dicta that "videotaping a person in his home, even while engaged in a conversation with an informer, could invade the privacy of the home in a way that audio taping the same conversation would not." However, the court continued in the very next sentence: "But this case has nothing to do with anyone's home. Here, Corona entered a stranger's hotel room for a five-minute meeting to conduct a business deal, which the stranger had consented to having videotaped." *Id.* The court held that on these facts, the defendant had no reasonable expectation of privacy that would even *implicate* the Fourth Amendment, let alone violate it. *Id.* at 982.

This is a good place to note that, contrary to Thompson's repeated characterizations of Knox's apartment as a homey private dwelling, the video recording and CI 292's report of the transaction both reveal that Thompson and his colleagues actually were using the space as "a commercial center to which outsiders are invited for the purposes of transacting unlawful business." *Lewis v. United States*, 385 U.S. 206, 211 (1966). CI 292 did not encounter June Cleaver cooking pot roast and tatting doilies, he encountered four strangers cooking crack wholesale and selling it retail, demonstrating vertical integration of their operation and literal compartmentalization of the two unseen workers ensconced in the closed bathroom where they were bagging rocks. All that was missing was a "Take a Number" sign. As the Court held in *Lewis*, such a home-based drug enterprise is entitled to no greater sanctity that if it were operating in a store, a garage, a car or on the street. For that reason, a government agent such as CI 292, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupants. 385 U.S. at 2011. The Court in *Lewis* closed its opinion by quoting at length from the government's brief, which I also will quote, changing only the name of the drug:

> In short, this case involves the exercise of no governmental power to intrude upon protected premises; the visitor was invited and willingly admitted by the suspect. It concerns no design on the part of a government agent to observe or hear what was happening in the privacy of a home; the suspect chose the location where the transaction took place. It presents no question of the invasion of the privacy of a dwelling; the only statements repeated were those that were willingly made to the agent and the only things taken were the packets of [*crack cocaine*] voluntarily transferred to him. The pretense resulted in no breach of privacy; it merely encouraged the suspect to say things which he was willing and anxious to say to anyone who would be interested in purchasing [*crack cocaine*].
>
> *Lewis*, 385 U.S. at 212; *see also United States v. Ressler*, 536 F.2d 208, 211-12 (7th Cir. 1976).

So, the fact that CI 292 was in the apartment at the time he videorecorded the crack sale is not a basis to suppress the videorecording. CI 292's presence in the apartment, standing alone, was not a trespass, and Thompson doesn't claim that it was. Rather, Thompson's claim is that CI 292's use of videorecording devices converted his presence into a trespass under *Jones* and *Jardines* because the use of such "sensory-enhancing" devices exceeded the scope of the "implied license" of entry that Thompson had granted CI 292.

Thompson's implied license argument doesn't have much traction because Thompson never would have permitted CI 292 to enter if he knew that CI 292 was a snitch, and *that's* not a trespass, *See Hoffa v. United States,* 385 U.S. 293, 303 (1966). Neither would Thompson have "licensed" CI 292's use of an audio-recording device while he was in the apartment buying crack; the law is clear, however, that the covert use of an audio-recorder in a suspect's home does not violate the suspect's reasonable expectation of privacy because this is a risk that the wrongdoer assumes. *United States v. White*, 401 U.S. 745, 751-2 (1971); *see also United States v. Eschweiler*, 745 F.2d 435, 437-38 (7th Cir. 1984).

The court's reasoning in *Eschweiler* seems to apply with equal force to the *images* captured by CI 292's two video recorders because these devices did not record any images that CI 292 did not also see, and the devices did not record these images at a higher quality than what CI 292 was seeing. Both of these facts are obvious from watching the videos that Thompson seeks to suppress. The "button cam" and the lower-positioned video recorder are facing forward, capturing what is in front of CI 292. Their angle of view is narrower than the human eye, and in any event, CI 292 walks and pivots through the front room of the apartment so that he and

the cameras are seeing the same things. The quality of the images is unexceptional; a teenager's old iPhones takes higher quality videos than these.

Most saliently, and as the government notes, all courts to have considered this question–including a district court in this circuit–have held that "a CI's use of video recording equipment is no less constitutional than the use of audio recording equipment when the CI has been admitted with the consent of the suspect and remains in the presence of the suspect for the duration of the recording." *United States v. Nash*,2013 WL 5503796 at *3 (S.D. Ind. 2013), citing and quoting *United States v. Deavis*, 326 F.3d 361, 366 (2nd Cir. 2003); *United States v. Lee*, 359 F.3d 194, 200 (3rd Cir. 2004); *United States v. Brathwaite*, 458 F.3d 376, 380 (5th Cir. 2006); *United States v. Wahchumwah*, 710 F.3d 862, 868 (9th Cir. 2013).

Thompson's attempts to distinguish this fusillade of unfavorable precedent are akin to defending against a MIRV launch with a parasol. Cases such *Florida v. Jardines*,561 U.S. 1, 133 S.Ct. 1409 (bringing a drug-detecting dog inside defendant's curtilage without permission constitutes trespass), *United States v. Jones*, 561 U.S. ___, 132 S.Ct. 945 (attaching a GPS device to defendant's Jeep without a warrant constitutes trespass) and *Kyllo v. United States*, 533 U.S. 27 (2001) (warrantless use of a thermal imaging device to detect heat radiating from inside defendant's residence violates Fourth Amendment) do not help Thompson because the video recording devices used by CI 292 were so unremarkable. These devices did not capture or reveal any sights or sounds beyond what CI 292 personally saw, heard and reported. If anything, they saw less, because their resolution was unexceptional and their field of horizontal view was narrower that CI 292's. In short, they were not "sensory enhancing devices" as Thompson

argues, nor were they "indiscriminate": the devices recorded only what CI 292 personally saw and heard after Thompson invited him in to sell him crack.

In a variation of this argument, Thompson suggests that video recording is an enhancement over audio recording alone and therefore ought not be condoned by reference to the cases condoning covert audio recording by informants. This argument has no traction because it compares *how* the informant recorded what Thompson voluntarily revealed to him, jumping past the fact that Thompson voluntarily revealed these things to him in the first place. Thompson surrendered any expectation of privacy in the activities and objects he exposed to CI 292's view. As the Court of Appeals for the Ninth Circuit put it when denying a similar challenge,

> We are persuaded that it is not 'constitutionally relevant' whether an informant utilizes an audio-video device, rather than merely an audio recording device, to record activities occurring inside a home, into which the informer has been invited. *United States v. Brathwaite,* 458 F.3d 380. When [defendant] invited Agent Romero into his home, he forfeited his expectation of privacy as to those areas that were 'knowingly exposed to' Agent Romero. *Katz v. United States*, 389 U.S. 347, 351 (1967). . . . [Defendant] cannot reasonably argue that the recording violates his legitimate privacy interests when it reveals no more than what was already visible to the agent.
>
> *United States v. Wahchumwah*, 710 F.3d at 867 (also citing and quoting *White*, 401 U.S. at 751).

As noted at the outset, this court can hypothesize scenarios that would present closer questions. Suppose this was an investigation into stolen radioactive material and CI 292 had covertly brought in a Geiger counter to detect the contraband? Or suppose this was an investigation into international citrus smuggling and CI 292 had brought in a detection dog from USDOA's Beagle Brigade, pretending it was his pet but actually watching for the dog to alert to

a hidden stash of foreign oranges? In either of these situations there would be a genuine question whether CI 292 had committed a trespass by exceeding the scope of Thompson's permission to enter the apartment. But we don't have such concerns here. As the the Court notes in *Jones*, "situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis." 132 S.Ct. at 953, emphasis in original.

It is understandable why Thompson wants the video recordings suppressed; it's hard to impeach or explain away an unedited videorecording of a hand-to-hand crack sale. But, having invited CI 292 onto the premises to make the sale, Thompson has no constitutionally protected expectation of privacy in what the informant saw, heard, and covertly recorded.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Aaron Thompson's motion to suppress the video recordings covertly made by a government informant.

Entered this 23rd day of January, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin 53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

January 23, 2015

Robert Anderson
Assistant United States Attorney
222 West Washington Avenue, Suite 700
Madison, WI 53703

Norman D. Singleton
Singleton Law Office
P.O. Box 967
Eau Claire, WI 54702

Re: United States v. Aaron Thompson
Case No. 14-cr-90-wmc

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before February 6, 2015 by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by February 6, 2015, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,
/s/
Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals. *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**